**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-02150-CMA

JOHN C. ARMIJO,

     Plaintiff,

v.

MICHAEL ASTRUE, Commissioner of Social Security,

     Defendant.

---

## ORDER

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff John Armijo appeals from the denial of disability benefits by the Social Security Commissioner ("Commissioner").  After a hearing on Plaintiff's application, the Administrative Law Judge ("ALJ") found that Plaintiff was not "disabled" within the meaning of the Social Security Act ("Act") because Plaintiff could perform gainful work within the regional and national economies despite his injuries.

## BACKGROUND

### I.   MEDICAL HISTORY

Plaintiff was born on February 9, 1958.  (*See, e.g.,* Administrative Record ("Admin.") at 24.)  He has achieved a tenth-grade education and can communicate in English.  (*Id.* at 24.)  His primary complaint concerns a nearly-twenty-year-old-work-related back injury, but he also complains of depression.  He alleges that back pain prevents him from bending over, sitting, standing, lifting and carrying for any extended

period of time.  (*Id.* at 119.)  Plaintiff filed an application for disability benefits on June 26, 2006, alleging a disability onset date of November 25, 2005.  His benefits would expire on December 31, 2009.  (*Id.* at 11.)

Plaintiff's primary treating physician was Dr. David Yamamoto, who first saw Plaintiff in 2004.  The record of Plaintiff's early visits to Dr. Yamamoto is sparse at best.  However, there are notes related to Plaintiff's broken right hand, which he suffered when he punched a door in May 2004.  (*Id.* at 172.)  Although doctors immobilized the hand with a cast for two months after the incident, Plaintiff continued to have pain that interrupted his work.  (*Id.*)  Dr. Yamamoto referred Plaintiff to Dr. Mitchell Fremling, who discussed surgery on the injured hand in August 2004.  (*Id.*)  Plaintiff underwent a corrective osteotomy in September 2004, but had complications from the surgery a month later when a pin that was inserted in Plaintiff's hand broke through his skin.  (*Id.* at 170.)  Plaintiff's hand still bothered him at the time of the ALJ hearing.

In October 2006, Dr. Yamamoto conducted an objective measurement of nerve function and found that the test results showed largely normal nerve function in Plaintiff's lower extremities.  (*Id.* at 191.)  However, Dr. Yamamoto concluded that the study was "consistent with a mild right L5 radiculopathy."  (*Id.* at 192.)  Dr. Yamamoto's progress notes from the same month state that Plaintiff presented with decreased lumbar flexion, extension, bilateral sacroiliac joint tenderness and moderate lumbar vertebral spine tenderness.  (*Id.* at 194.)  Plaintiff was negative on a straight-leg-raising test and sensory exam and he showed normal curvature of the spine.  (*Id.*)  Dr. Yamamoto diagnosed Plaintiff as having a sprain or strain of the sacroiliac region, low back pain and depressive disorder and Dr. Yamamoto prescribed pain medications

to treat Plaintiff's symptoms.  (*Id.* at 195.)  Additional progress notes in December 2006

contained similar diagnoses and also stated that Plaintiff had begun DRX treatment,

which Plaintiff reported "was working."[1]  (*Id.* at 223.)

Regular progress notes from Dr. Yamamoto indicate that Plaintiff's diagnoses

and treatment did not change much from December 2006 through March 2008.  For

example, in March 2007, Dr. Yamamoto noted that Plaintiff suffered from depression,

but that "Lexapro helps."  (*Id.* at 226.)  Dr. Yamamoto repeats this statement throughout

his progress notes without additional comments or analysis.  During that same March

2007 visit, Dr. Yamamoto again noted that Plaintiff had decreased lumbar flexion but

this time added that Plaintiff could "bend forward and touch his fingertips to his knees."

(*Id.*)  A followup by Dr. Yamamoto later that month noted that Plaintiff "appears

uncomfortable," and that the pain medication "doesn't work that well."  (*Id.* at 228.)

By May 2007, the back pain had intensified and become worst in the right hip area.

(*Id.* at 234.)  Plaintiff asked for a referral for "possible injections."  (*Id.*)  In August 2007,

Plaintiff reiterated his request for injections and again noted that the pain medications

were "not working that well."[2]  (*Id.* at 236.)

Plaintiff also reported pain and cramps in his feet, so Dr. Yamamoto added

restless leg syndrome ("RLS") to his list of diagnoses in a later August 2007 progress

note.  (*Id.* at 238.)  In January 2008, Dr. Yamamoto noted that Mirapex proved helpful

for the restless leg syndrome, but that Plaintiff could not afford it.  (*Id.* at 253.)

---

[1]  DRX is a type of traction therapy.

[2]  Apparently, the trigger point injections provided Plaintiff relief, but he only used them intermittently.  (*Id.* at 255.)

Plaintiff also had recurring issues with gout, which may have related to his use of alcohol.  In April 2007, he presented to Dr. Yamamoto with pain in his left foot that Dr. Yamamoto attributed to gout.  Similar pain occurred in his knee later in the year.  (*Id.* at 232, 240.)  It is unclear how the RLS or the gout limited Plaintiff's functioning or how or if related these two conditions were related to Plaintiff's back injury.

In October 2007, Dr. Yamamoto completed a "Disability Report" for Plaintiff and Plaintiff's counsel.  (*Id.* at 197.)  The Report purports to analyze Plaintiff's functional capacities and answers a series of questions regarding Plaintiffs abilities.  For example, Dr. Yamamoto concluded that Plaintiff had severe restrictions on his ability to lift and carry (never more than ten pounds on a sustained basis, very rarely eleven to twenty pounds), he concluded that Plaintiff had restrictions on his ability to sit, stand, or walk (up to 60 minutes of sitting per episode, thirty minutes of standing per episode, fifteen to twenty minutes of walking per episode, no more than three hours sitting per eight-hour day, no more than two hours of standing or walking per eight-hour day), he concluded that Plaintiff had milder limitations on the use of his hands or feet (occasional reaching, handling, fingering, feeling) and his ability to achieve certain postures (occasionally balance, stoop, crouch), but a total limitation on his ability to climb, crawl, and kneel. (*Id.* at 197-98.)  Dr. Yamamoto opined that no treatment would improve Plaintiff's pain conditions and that Plaintiff would require frequent breaks during the day and miss three to five days of work per month.  (*Id.* at 199.)

Dr. Yamamoto completed a similar assessment of Plaintiff's physical functioning capacity after the ALJ hearing.  (*Id.* at 283-86.)  In the later report, Dr. Yamamoto affirmed his earlier diagnoses and gave Plaintiff a "fair" prognosis.  (*Id.* at 283.)

Dr. Yamamoto essentially repeated the functional limitations (*e.g.*, time sitting, standing, walking, ability to lift and carry) from his October 2007 functioning assessment. However, Dr. Yamamoto added that Plaintiff's anxiety and depression "may limit his ability to work, concentrate [and] handle stress." (*Id.* at 286.)

The records also raise some questions regarding potential substance abuse. At least one drug test report indicated a positive result for cocaine in September 2006 (*id.* at 257), although no doctors seem to have made much out of the result. However, Dr. Yamamoto did note that Plaintiff's drinking may have contributed to his gout flare ups and that he occasionally drank heavily. (*Id.* at 232, 240.)

Plaintiff also saw W.E. Wisner, Ed.D., a psychologist in May 2008, after the ALJ hearing. Dr. Wisner issued a report stating that Plaintiff "does not appear to have cognitive problems," and found his results on various functioning tests to be either "low average" or "average." (*Id.* at 275-80.) Dr. Wisner assessed Plaintiff's "Full Scale IQ" at 78, which Dr. Wisner noted was "within the Borderline range of intellectual functioning." (*Id.* at 276.) Notably, Dr. Wisner stated that Plaintiff "reports depression, which seems rather severe beginning approximately two years ago when he could no longer work." (*Id.* at 276.) Dr. Wisner's report on Plaintiff's depression states that Plaintiff tried two antidepressant medications "but felt suicidal on both." (*Id.*) Dr. Wisner concluded that Plaintiff would need "treatment for his depression in order to recover." (*Id.* at 279.)

Plaintiff's own "Function Report" indicates that he does not have any trouble with personal care or grooming as a result of his alleged disabilities. (*Id.* at 127.) Plaintiff also states that he can complete "light house work," he can water the lawn, and do

5

laundry on certain days.  (*Id.* at 128.)  Plaintiff can go out alone, drive a car and handle

personal finances.  (*Id.* at 129.)  For entertainment, Plaintiff watches the news on a daily

basis, interacts with family members and attends church.  (*Id.* at 130.)

## II.   PROCEDURAL HISTORY

### A.   The ALJ Hearing

Plaintiff testified that he was almost 50 years old on the date of the hearing, that

he had a tenth-grade education and no additional schooling or GED-like certification

(*Id.* at 24.)  He described his job history in construction,[3] working as a clerk in a liquor

store and, most recently, as a street sweeper driver for a local gas station and

convenience store chain.  (*Id.* at 24-26.)  Plaintiff also described the genesis of his back

injury, an on-the-job-incident involving a jackhammer in 1990.  (*Id.* at 26-27.)  He stated

that his back pain has been with him since the jackhammer incident and that his back

condition had deteriorated over the years and that pain and numbness had spread to

his legs.  (*Id.* at 28.)

Plaintiff also testified regarding his daily activities and physical limitations.  He

stated that he could only sit or stand for approximately fifteen to twenty minutes before

he would have to change positions.  (*Id.* at 30.)  He testified that he rarely lifted

anything, but that he played with his one-year-old grandson, whom Plaintiff estimated

to weigh about ten to fifteen pounds.  (*Id.* at 30.)  Plaintiff also identified a right-hand

fracture that caused him some pain and trouble, especially when the weather turned

---

[3]   His construction work involved quite onerous physical demands, but Plaintiff appears
to have stopped working in that industry prior to the alleged onset of his disability.  (*See id.* at
134-41.)

cold.  (*Id.* at 32.)  He stated that his right hand is his dominant hand and that the pain would sometimes cause him to drop things like a drinking glass or small coins.  (*Id.*)  He stated that his hearing, especially at higher pitches, was failing him and that hearing aids were likely in his future.  (*Id.* at 32-33.)  Plaintiff admitted that he had no limitations on his ability to drive, but he did not take "long drives."  (*Id.* at 36.)  He testified that he no longer enjoyed his former hobbies of swimming, camping, fishing, bowling and billiards because of his back pain.  (*Id.* at 37.)

Plaintiff testified that he lived with his wife in a house with his twenty-eight-year-old daughter and sixteen-year-old son; both kids helped out around the house.  (*Id.*)  However, Plaintiff did help with chores:  he made coffee and breakfast or lunch for his wife, did dishes, cleaned the house and washed and folded clothing.  (*Id.*)  His wife did most of the cooking and shopping and his kids did the yard work.  (*Id* at 36-37.)

He also identified the medications that he took to relieve his pain (namely, Percocet) and other pain relief methods including, hot bathes, pain-relief creams and a massage mat that he uses on his bed.  (*Id.* at 34.)  He stated that he would lay down or use a hot bath tub two to three times per day, usually for fifteen to twenty minutes.  (*Id.* at 35.)

B.    The ALJ's Written Decision

The ALJ issued a written decision denying Plaintiff's application for benefits on January 24, 2008.  After setting out the applicable law and describing the standards to be applied, the ALJ made eleven findings of fact and conclusions of law.  (*Id.* at 11-20.)  As is relevant to Plaintiff's case, the ALJ found that Plaintiff had only one severe impairment, degenerative disc disease of the lumbar spine.  (*Id.* at 14.)  The ALJ then

proceeded to determine Plaintiff's residual functional capacity ("RFC").  The ALJ found that Plaintiff could occasionally lift and carry twenty pounds, ten pounds frequently; sit, stand or walk for six hours out of an eight-hour day; and occasionally climb, balance, stoop, kneel, crouch and crawl.  (*Id.* at 15.)  The ALJ stated that he made his RFC assessment based on the factors outlined in 20 C.F.R. § 404.1529(c) as applied to the record before him and Plaintiff's testimony at the ALJ hearing.

The ALJ did not find Dr. Yamamoto's opinions regarding Plaintiff's functional capacity very persuasive and he gave them little weight.  (*Id.* at 18.)  The ALJ concluded that Dr. Yamamoto's opinions were internally inconsistent as they related to Plaintiff's ability to sit for thirty to sixty minutes at a time and Plaintiff's ability to perform manipulative functions with his hands, that Dr. Yamamoto's opinions regarding Plaintiff's ability to balance were contradicted by a hearing exam and that other of Dr. Yamamoto's functional assessments were unsupported by objective examination evidence. (*Id.*)  The ALJ also discredited Dr. Yamamoto's functional assessment because it relied in part on Plaintiff's 1991 finding of impairment, which conflicted with Plaintiff's construction work history over that decade.  (*Id.*)

The ALJ also found Plaintiff's own testimony regarding his symptoms to lack credibility.  (*Id.*)  The ALJ noted the gap in treatment between Plaintiff's alleged onset date and October 2006, which the ALJ took to mean that Plaintiff's symptoms were not as severe as Plaintiff claimed them to be.  (*Id.*)  The ALJ also noted that, despite his complaints of nearly debilitating leg pain, Plaintiff's medical records did not support his complaints.  (*Id.*)  Likewise, Plaintiff's DUI did not help his credibility with the ALJ.  (*Id.*)

Based on the RFC determination, Plaintiff's age, education and work history, the ALJ found that Plaintiff could not return to any of his previous work.  (*Id.*)  However, the ALJ relied upon the Medical-Vocational Rules (the "Grids"), specifically Grid 202.17 to find that Plaintiff could perform a full range of light work.  (*Id.*)  Thus, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act because he could perform work that existed within the national economy.  (*Id.*)

C.     The Appeals Council's Decision

The Social Security Appeals Council denied Plaintiff's petition for review. (*Id.* at 1.)  In a notice of its decision, the Appeals Council stated that the new evidence submitted by Plaintiff did not establish "greater work restrictions than found in" the ALJ's written decision.  (*Id.*)  The Appeals Council likewise rejected Plaintiff's contention that the ALJ had improperly declined to give controlling weight to Dr. Yamamoto's opinion. (*Id.* at 2.)  Thus, the Appeals Council found that Plaintiff had not provided a basis for changing the ALJ's decision.

**STANDARD OF REVIEW**

Section 405(g) of the Act establishes the scope of this Court's review of the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under

9

subsection (a) of this section, the court shall review only the question
of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g).  Thus, this Court's review is limited to determining whether

the record as a whole contains substantial evidence supporting the Commissioner's

decision.  *See* § 405(g); *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495,

1497–98 (10th Cir. 1992).  The Court must uphold the Commissioner's decision if it is

supported by substantial evidence.  See *Dollar v. Bowen*, 821 F.2d 530, 532

(10th Cir. 1987).  This Court cannot re-weigh the evidence nor substitute its judgment

for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987).  That does

not mean, however, that review is merely cursory.  To find that the ALJ's decision is

supported by substantial evidence, the record must include sufficient relevant evidence

that a reasonable person might deem adequate to support the ultimate conclusion.

*Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on

substantial evidence if it is overwhelmed by other evidence in the record or if there is a

mere scintilla of evidence supporting it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir.

1985).  The ALJ's decision is also subject to reversal for application of the wrong legal

standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

## ANALYSIS

Under the standard of review described above and the applicable law described

below, the Court will remand the case for proceedings consistent with this opinion.

## I.    APPLICABLE LAW

A claimant must qualify for disability insurance benefits under the Social Security

Act.  To do so, the claimant must meet the insured status requirements, be less than sixty-five years of age and under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In proving disability, a claimant must make a prima facie showing that he is unable to return to the prior work he has performed.  *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability insurance benefits.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis).  A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded.  *See* 20 C.F.R. § 404.1520(a); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity.  20 C.F.R. § 404.1520(b). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. § 404.1520(c).  At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled.  § 404.1520(d).  If

the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step.  At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past.  *See Williams*, 844 F.2d at 751 (citations omitted).  If the claimant is able to perform his previous work, he is not disabled.  20 C.F.R. § 404.1520(e); *Williams*, 844 F.2d at 751.  The fifth step requires the Commissioner to demonstrate that:  (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy.  *See*  20 C.F.R. § 404.1520(f); *Williams*, 844 F.2d at 751.

## II.   THE ALJ'S ANALYSIS OF PLAINTIFF'S DEPRESSION

Plaintiff's first point of contention is that the ALJ did not apply the proper legal standard in evaluating Plaintiff's depression.  Plaintiff correctly points out that the regulations contain a special technique to evaluate mental impairments at the second and third steps of the five-step process.  However, Plaintiff is incorrect in arguing that the ALJ erred in this case.

### A.   The Special Technique For Evaluation Of Mental Impairments

Although the usual five-step process for evaluation of a disability applies to evaluation of mental impairments, 20 C.F.R. § 404.1520a spells out a separate, "special technique" that the ALJ must follow, as well.  *See* § 404.1520a.  The first step of the special technique is to evaluate a claimant's "symptoms, signs, and laboratory findings to determine whether [a claimant] has a medically determinable mental impairment(s)." § 404.1520a(b)(1).  A claimant's burden to show a mental impairment is practically

12

identical to a claimant's burden to prove a physical impairment; both require "medically acceptable clinical and laboratory diagnostic techniques" that provide "medical evidence" beyond a claimant's own statements.  *See* 20 C.F.R. §§ 404.1508 and 416.920(a)(4)(ii) (describing what a claimant must show to establish an impairment); *see also Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003) (noting that claimant must establish more than "mere presence of a condition" to show an impairment); SSR 85-28 (noting that to be found disabled, a claimant must show an "impairment of such severity that it precludes his or her engaging in any substantial gainful work") (internal quotations omitted).  If the claimant cannot prove that he suffers from a medically determinable mental impairment severe enough to interfere with his ability to work, that is the end of the analysis.  *See* § 416.920(a)(4)(ii).  However, if an impairment is identified, the ALJ must "then rate the degree of functional limitation resulting from the impairment . . . ." § 404.1520a(b)(2).[4]  The regulations require the ALJ to document each portion of the special technique. § 404.1520a(e).

   B.   The ALJ Was Not Required To Use The Second Step Of The Special Technique.

   Plaintiff argues that the ALJ found that Plaintiff suffered from a medically determinable mental impairment, depression, but that the ALJ failed to apply the second half of the special technique.  However, Plaintiff misinterprets the ALJ's written opinion and the requirements of a medically determinable mental impairment.

   By stating that Dr. Yamamoto had diagnosed Plaintiff with depression, the ALJ

---

   [4]   This second step of the special technique is where the ALJ analysis of a mental impairment would normally diverge from a typical analysis under the usual five-step process.

was not, as Plaintiff argues, finding that Plaintiff's depression amounted to a severe

medically determinable impairment.  Thus, the ALJ did not need to move to the second

step of the special technique and rate the degree of functional limitation.  Instead, the

ALJ was merely recounting his review of Plaintiff's medical evidence and noting that

Plaintiff may have a mental condition, but that the condition was well-controlled

by medication and not severe enough to interfere with Plaintiff's ability to work.

A claimant's mere mention of a symptom or condition is not enough to transform the

symptom or condition into a medically determinable impairment.  *See Williamson*,

350 F.3d at 1100 (holding that a claimant's failure to make the threshold showing of

a severe impairment excuses ALJ from proceeding to next step in analysis).

Moreover, substantial evidence supports the ALJ's determination that

Plaintiff's depression was not severe enough to preclude Plaintiff from working.

As Dr. Yamamoto repeatedly stated in his progress notes, the Lexapro helped Plaintiff's

depression.  There is no other mention of depression or mental impairments causing

Plaintiff to suffer any type of functional limitation until Dr. Wisner's report, which was not

submitted until after the ALJ hearing.  Additionally, Plaintiff and his counsel failed to

raise the issue of depression in the ALJ hearing and only mention it in passing in their

written submissions.

Therefore, the Court concludes that the ALJ's decision that Plaintiff did not suffer

from a severe medically determinable mental impairment is supported by substantial

evidence and the ALJ did not have to proceed to the second step of the special

technique.

C.   The ALJ Was Not Required To Recontact Plaintiff's Physicians Regarding Depression.

Plaintiff also argues that the ALJ failed to sufficiently develop the medical record regarding Plaintiff's depression.  However, as the Commissioner points out in his brief, an ALJ's duty to develop the record is not unqualified.  *See Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) ("The ALJ does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning."); *cf. Henrie v. Department of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993) (ALJ has duty of inquiry to develop record "consistent with the issues raised").  Only if an issue raised by the record is "material," does an ALJ have a duty to request further examination or recontact a treating source.  *Hawkins*, 113 F.3d at 1168.

In this case, Plaintiff did not adequately raise the issue of his depression until after the ALJ hearing.  Testimony regarding Plaintiff's depression is conspicuously absent from the hearing transcript, reflecting that neither Plaintiff nor his counsel considered depression to be a material issue at his disability hearing before the ALJ.  Moreover, Plaintiff's own application for benefits focuses on his back pain, not his alleged mental impairment.  Plaintiff cannot simply hope the ALJ will discover all of his potential impairments from the medical records, Plaintiff must raise them himself, especially when the impairment is not well-developed by the documents.  Because neither Plaintiff nor his counsel raised the issue of depression at the hearing and because Dr. Yamamoto's notes on the subject did not raise any material questions for inquiry by the ALJ, the Court concludes that the ALJ's decision not to recontact Plaintiff's doctors regarding Plaintiff's depression is supported by substantial evidence.

15

### III.   THE ALJ'S ANALYSIS OF DR. YAMAMOTO'S OPINIONS

Plaintiff next argues that the ALJ erred in declining to give controlling weight to the opinions of Dr. Yamamoto, Plaintiff's treating physician.  The Court disagrees and finds the ALJ's decision to be supported by substantial evidence.

   A.   Treating Medical Opinions Are Typically Given Controlling Weight.

A treating physician's opinion regarding "the nature and extent of a claimant's disability is entitled to 'controlling weight' when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with other substantial evidence in [the claimant's] case record."  *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (quoting 20 C.F.R. § 416.927(d)(2)) (alterations in original); *see also Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  If the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must "give good reasons" for the weight given to a treating physician's opinion.  20 C.F.R. § 416.927(d)(2); *see also Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (requiring ALJ to supply "specific, legitimate reasons" for rejecting opinion of treating physician).  However, the ALJ does not have to provide a formulaic recitation of every reason that he discounts a treating physician's opinion. *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

   B.   The ALJ Gave Good Reasons For Failing To Accord Dr. Yamamoto's
        Opinion Controlling Weight

Plaintiff argues that the ALJ should have given Dr. Yamamoto's October 2007 evaluation of Plaintiff's functional capacity controlling weight.  He contends that the only inconsistent evidence in the record is the opinion of the state decision-maker,

Ms. Eschenbaum, and that this is insufficient to discredit Dr. Yamamoto as a treating source.  Plaintiff focuses his argument on the narrow issue of Ms. Eschenbaum's opinions, but the fact that the ALJ's RFC assessment corresponds with the Ms. Eschenbaum's RFC assessment is not a sufficient ground to reverse or remand.

In contrast to Plaintiff's arguments, the ALJ's written decision devotes nearly a full page to explaining the problems he perceived in Dr. Yamamoto's opinion.  First, the ALJ points out that Dr. Yamamoto's opinions regarding Plaintiff's ability to sit for a length of time are internally inconsistent.  The ALJ notes the discrepancy between Dr. Yamamoto's opinion that Plaintiff must change positions every twenty to the thirty minutes and Dr. Yamamoto's opinion that Plaintiff could sit for thirty to sixty minutes per episode.  (Admin. at 18.)  Second, the ALJ points out that Dr. Yamamoto's opinions are internally inconsistent on the topic of Plaintiff's ability to use his hands and fingers for manipulation.  (*Id.*)  Third, the ALJ points out that Dr. Yamamoto's opinions conflict with other medical evidence in the record, *e.g.,* the opinion that Plaintiff suffers from balance limitations conflicts with Plaintiff's own denial of balance issues at a 2007 hearing examination.  (*Id.*)  Fourth, and perhaps most critically, the ALJ notes that Dr. Yamamoto's opinions regarding the severity of Plaintiff's symptoms lack an objective medical basis.  These types of inconsistencies and deficiencies are exactly the type of "good reasons" that an ALJ must explain when deciding not to give a treating physician's opinions controlling weight.

Moreover, in determining Plaintiff's RFC, the ALJ did not rely entirely on Ms. Eschenbaum's opinion.  The ALJ stated in his decision that his RFC assessment "is consistent with and supported by the objective medical signs and findings," and

17

this Court agrees.  (*Id.* at 19.)  Indeed, the ALJ appears to have adopted some of Dr. Yamamoto's suggestions regarding Plaintiff's limitations.  For example, the ALJ found that Plaintiff could occasionally balance, stoop and crouch, just like Dr. Yamamoto did.  The ALJ's RFC assessment also conforms to the results of Dr. Yamamoto's nerve function study and MRI evidence, which indicated that Plaintiff did suffer from various back impairments, but that the impairs were not totally debilitating.

The Court is somewhat troubled by the ALJ's decision to discredit the opinion of the only substantial treating medical source in the records.  However, the ALJ did not totally reject Dr. Yamamoto's opinions; the ALJ merely declined to give weight to certain purported functional limitations that Dr. Yamamoto found Plaintiff to possess, while, at the same time, adopting other more objective components of Dr. Yamamoto's treating records to arrive at his RFC assessment, *e.g.,* the nerve function test and MRI results. Thus, the Court ultimately concludes that ALJ acted within his province in declining to give controlling weight to Dr. Yamamoto's opinions.

## IV.    THE ALJ'S USE OF THE GRIDS

The ALJ relied on Grid 202.17 in finding that jobs existed for a person with Plaintiff's functional capacity within the national economy.  Plaintiff argues that the ALJ erred when he relied on the Grids because they do not account for certain nonexertional limitations possessed by Plaintiff.

### A.    Use Of The Grids To Determine Whether Jobs Exist

The Commissioner bears the burden of showing that work exists within the national economy for a particular claimant based on the claimant's age, education, work

18

history, and RFC.  *See Williams*, 844 F.2d at 751.  When a claimant's characteristics

meet the criteria outlined in a particular section of the Grids, they allow the ALJ to

determine that a claimant is not disabled within the meaning of the Act.  *See* 20 C.F.R.

pt. 404, subpt. P, app. 2.  *See also Channel v. Heckler*, 747 F.2d 577, 578 (10th Cir.

1984).  However, the Grids will not apply in all cases and "some claimants may possess

limitations that are not factored into the guidelines."  *Heckler v. Campbell*, 461 U.S. 458,

462 n.5 (1983).  Thus, an ALJ should not apply the Grids mechanically without

consideration for the particular claimant's situation.  *Id.*

  B. <u>The ALJ Could Rely On The Grids</u>

  Plaintiff argues that the ALJ erred in using the Grids in his case because they

did not account for nonexertional limitations on Plaintiff's functioning, as described by

Dr. Yamamoto.  Specifically, Plaintiff contends that the Grids failed to account for his

limitations on grasping, manipulating, climbing, balancing, stooping, crouching, kneeling,

crawling and being in dangerous environments.  (Doc. # 17 at 17.)

  However, because the ALJ properly rejected the opinions of Dr. Yamamoto as

his opinions related to certain of Plaintiff's functional areas, the ALJ did not err by

excluding Dr. Yamamoto's nonexertional limitations from the Grid analysis.

  Moreover, contrary to Plaintiff's argument, the ALJ recognized that the Grids did

not specifically account for certain of Plaintiff's nonexertional limitations described by the

ALJ's RFC assessment.  (Admin. at 19.)  However, the ALJ found that these

nonexertional limitations (*e.g.,* occasional stooping, balancing and bending) would

not affect the occupational base of unskilled, light work described by the Grids.  (*Id.*)

The ALJ's opinion is directly supported by SSR 83-14, which states, "to perform

substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally[,]" and SSR 85-15, which states that "some limitation" on climbing and balancing "would not ordinarily have a significant impact on the broad world of work."  Thus, the Court concludes that the ALJ's use of the Grids is supported by substantial evidence.

## V.   NEWLY SUBMITTED EVIDENCE

Finally, Plaintiff argues that the Appeals Council should have considered Dr. Wisner's May 2008 evaluation and Dr. Yamamoto's June 2008 report and altered the ALJ's decision.

### A.   Elements Relating To Consideration Of Additional Evidence

For the Appeals Council to consider additional evidence, a claimant must meet three elements, he must the evidence was:  (1) new; (2) material; and (3) related to the period on or before the date of the ALJ's decision.  *See Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004).  Evidence is "material" if there is a strong possibility it would have changed the ALJ's decision.  *Id.*

### B.   The Appeals Council Correctly Declined To Consider Additional Evidence.

The Appeals Council found that neither Dr. Wisner's May 23, 2008 report nor Dr. Yamamoto's June 5, 2008 report would have altered the ALJ's decision.  Plaintiff contends this was incorrect under *Chambers.*  The Commissioner argues that the Appeals Council correctly declined to review the ALJ's decision because the new reports were not material; they did not contain any new objective information that would have changed the ALJ's decision.

20

The Court agrees with the Appeals Council and the Commissioner regarding Dr. Yamamoto's new report.  Nothing in that report drastically alters or changes any of Dr. Yamamoto's prior opinions.  Instead of offering any new objective evidence (*i.e.*, test results) of functional limitations, Dr. Yamamoto simply completed a fill-in-the-blank form regarding Plaintiff's functional capabilities.  The form did not depart in any significant respect from Dr. Yamamoto's October 2007 report.  Thus, the Court concludes that the Appeals Council did not err in declining to review the ALJ's decision on the basis of Dr. Yamamoto's new report.

Dr. Wisner's report raises a closer call than Dr. Yamamoto's report.  Dr. Wisner addressed Plaintiff's mental condition and cognitive functioning in greater depth than any other medical source in the record.  Dr. Wisner also identified new, albeit subjective, information regarding the ineffectiveness of antidepressant medications that Plaintiff had been taking.  Dr. Wisner's opinions regarding Plaintiff's depression contradicted directly with both Dr. Yamamoto's opinion that Lexapro "help[ed]" and the ALJ's written decision, which stated that Plaintiff's depression was "controlled with medication."  Additionally, Dr. Wisner's report indicated that Plaintiff's depression "seems rather severe beginning approximately two years ago when he could no longer work."

At first glance, Dr. Wisner's opinion may seem material to the ALJ's decision, especially since it contradicts the ALJ's statement regarding Plaintiff's depression.

However, Plaintiff's complete failure to raise the issue of his mental condition before the ALJ (either during the ALJ hearing or in any written submissions to the ALJ)

leads the Court to conclude that the report is not material to the issues before the ALJ.[5] The ALJ could not have altered his decision based on Dr. Wisner's report because Plaintiff did not raise the issue.  *See Hawkins*, 113 F.3d at 1167 ("the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored" and the ALJ "may ordinarily require counsel to identify the issue or issue requiring further development").  Although the ALJ recognized that Dr. Yamamoto had diagnosed Plaintiff with depression (or at least prescribed Lexapro for treatment of depression), Plaintiff's mental functioning was not an impairment that Plaintiff argued entitled him to disability benefits until after the ALJ's decision.  Thus, the issues regarding Plaintiff's depression were a footnote at best in the ALJ's analysis and they were not substantial enough to affect the ALJ's determination regarding Plaintiff's ability to work within the national economy.  The fault for failing to raise the issue of depression in front of the ALJ lies with Plaintiff and his counsel, and Plaintiff cannot raise a new issue after the fact in hopes of altering a negative decision.

As the Commissioner's counsel pointed out during the hearing before this Court, if depression or any of the other cognitive issues raised by Dr. Wisner's report has now become a viable ground for a finding of disability, Plaintiff may file a new application raising the issue.  The Court concludes that a new application is the better method to address the new evidence that Plaintiff seeks to admit.

---

[5]   Plaintiff also stopped taking Lexapro, which, when viewed under the lens of the substantial evidence standard, indicates that he did not consider his depression to be functionally limiting.

**<u>CONCLUSION</u>**

Plaintiff presents numerous issues for review.  Plaintiff's arguments raise

interesting issues, but the Court concludes that none require remand or reversal of

the ALJ's decision.

Accordingly, the decision of the Commissioner is AFFIRMED AND ADOPTED.

DATED:  June __2nd__, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge